**In re Jesse Allan JOHNSON and Jean F. Johnson, Debtors.**

**PACIFIC WESTERN BANK, a state banking institution, Plaintiff,**

v.

**Jesse Allan JOHNSON and Jean F. Johnson, Defendants.**

Bankruptcy No. 383–04106.
Adv. No. 84–0165.

United States Bankruptcy Court, D. Oregon.

Dec. 1, 1986.

Thomas Dulcich, Portland, Or., for plaintiff.

Magar E. Magar, Portland, Or., for debtors/defendants.

## MEMORANDUM OPINION

ELIZABETH L. PERRIS, Bankruptcy Judge.

The Plaintiff in this proceeding, Pacific Western Bank, seeks to bar the discharge of the Debtor, Jesse A. Johnson,[1] pursuant to the provisions of §§ 727(a)(2), (a)(3), (a)(4) and (a)(5) of the Bankruptcy Code.[2] At trial, the Bank presented extensive evidence concerning the Debtor's financial activities during the year proceeding the filing of the bankruptcy petition, and of the disappearance of a large sum of cash during that time. It also presented evidence concerning omissions of facts made by the Defendant on his bankruptcy schedules and statements, and misrepresentations made by the Defendant during the course of the bankruptcy proceeding. The Defendant presented evidence to account for some of the cash, and contends that while he has no memory of exactly how the rest of the money was spent, it is gone and most likely went to support his drug, alcohol and prostitution activities. He acknowledges that his bankruptcy statement of affairs contains errors and omissions but attributes the errors to negligence on the part of his former attorney in completing the forms. Those errors which cannot be attributed to attorney error, he contends, were the product of innocent misunderstandings, forgetfulness and mistakes. He denies that they were the result of an intent to defraud anyone.

## I. Facts.

Mr. Johnson holds a bachelors degree in business and management from Oregon State University. He has been in the real estate business for 19 years. During that time, he has engaged in both real estate development and appraisal work. He is a licensed real estate appraiser and income tax preparer. In 1976, Mr. Johnson, along with Mr. Charles Fox, formed a real estate company. According to the Debtor's statement of affairs, that company was terminated in 1980. In September 1980, Mr. Johnson issued a financial statement for both himself and Mr. Fox which showed a net worth of over two million dollars.

On December 14, 1983, Mr. and Mrs. Johnson filed a Chapter 7 petition listing on their schedules no cash, and no assets beyond those subject to personal exemption. The evidence shows that in the year prior to the filing of the petition the Johnsons[3] had at least $106,677.88 available. That sum consisted of the following:

| | |
|---|---|
| $35,521.75 | Funds in accounts with various commercial institutions on December 14, 1982 |
| $41,049.33 | Proceeds from sale of Debtor's personal residence |
| $ 1,437.11 | Proceeds from sale of the Debtor's Hollywood Garden lot |
| $ 9,900.00 | Proceeds from sale of the Debtor's Eastwood property |
| $ 9,000.00 | Proceeds from sale of the Debtor's Mather Road property |
| $ 1,500.00 | Proceeds from settlement of a malpractice lawsuit |

1. The complaint originally named Jean F. Johnson as codefendant. The Court severed trial of the claims asserted against Mrs. Johnson in this proceeding upon her conversion to Chapter 13.

2. All citations in this Opinion are to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (West Supp.1986) unless otherwise designated.

3. In the years prior to the filing of the bankruptcy, all household income was generated by Mr. Johnson. Mrs. Johnson was not employed outside the home during those years. Sometime before 1983, several pieces of property which were once in Jesse's name, or held jointly, were put into Jean's name, including the family residence. Jean testified that no consideration was given for these transfers. Thus, the Court will consider all income to be family income and property held in Jean's name to be Jesse's if Jesse retained beneficial use and control of the property. The properties pertinent to this proceeding which were held in Jean's name but which Jesse retained beneficial use and control over were: the family residence, the Hollywood Garden lot, the Eastwood property and the Mather Road property.

$ 7,419.00  Income from Jesse Johnson's appraisal work
$  850.00  Income from Jesse Johnson's tax preparation work for H & R Block

Of the above sums, the only disputed amount is the $1,437.11 received from the sale of the "Hollywood Garden" lot. The Bank contends that the Defendant received $6,000 for the lot, but this was directly contradicted by the testimony of the man who purchased the property. The Court sees no reason not to accept the testimony of the purchaser, who appeared to be a very credible witness.

Jean Johnson prepared an accounting of the money she personally spent during the year prior to filing. She was responsible for the couple's two children and the household purchases. She made several installment payments on the family residence and business properties. She also made a payment of $7,546 for back taxes during the year, and payments of $4,977.08 for attorney fees. She testified that the family made no trips outside Oregon, made no major purchases of personal property, and no purchase of real property during that year. There is no evidence of major medical expenses. After the sale of the family residence in February 1983, the family paid $425 a month in rent. Mrs. Johnson felt she could account for the use of approximately $67,300 of the total amount of funds and believes that Jesse must have spent the remainder on his drinking binges.

In the year prior to the filing of the petition, Mrs. Johnson kept thousands of dollars in a drawer in the family kitchen. (At least $25,000 from the proceeds of the house alone ended up in the drawer.) She used this cash to make every day purchases. She testified that Jesse knew of the cash in the drawer, and stated that he probably took money from the drawer, but she did not know how much he took. On November 9, 1983, Mrs. Johnson withdrew $12,436.02 from her account with Lehman Brothers and closed that account. She stated that this cash was placed in the drawer and spent prior to the filing of the bankruptcy petition 35 days later.

Mrs. Johnson's accounting is not supported by records or documentation of any sort. The Johnsons' claim that they kept adequate records, but they destroyed the records after the Bankruptcy Court erroneously notified them that they had received a discharge. This claim is supported by a letter written by the trustee who congratulated the Johnsons on the completeness of their records.

Mrs. Johnson testified that her husband has a severe alcohol problem. He was under medical treatment for alcoholism during 1978 and 1979. She believed his condition improved in 1980–82, but worsened in 1983 when "the bottom" fell out. She stated that he would be away for days at a time when he got drunk.

Mr. Johnson also testified that his long standing alcohol problem became worse in 1983. He stated that he would drink any time he had the money and was depressed, which, he stated, was often in 1983. He would go on "binges" and black out. When he awoke he would have no memory of what he did, or how he got where he was. Once he started drinking he would also use drugs, namely cocaine and marijuana. He also stated that he spent money on prostitutes when he was drinking. Mr. Johnson was not specific about how much money he spent on any particular activity, but was certain that this is how all the cash that came into his hands in 1983 was spent.[4]

While the defense presented records of alcohol treatment in prior years, there is no evidence of alcohol or drug treatment in 1983 even though the family continued to make payments to the medical plan which treated Mr. Johnson in 1978–79. Mr. Johnson stated that he attended a couple of

4. The Court can trace $31,800 directly to Jesse. The evidence showed he personally received $10,000 from the proceeds of the house, $9,000 from the Mather View property, $9,900 from the Eastwood property, $1,437.11 from the Holly- wood Garden lot, and $1,500 as settlement of a lawsuit. The Court cannot ascertain how much money Jesse may have taken from the kitchen drawer.

AA meetings in 1983, but that was the extent of his treatment that year.

The Johnsons' testimony as to the severity of Mr. Johnson's alcohol problem in 1983 is undercut by the testimony of Mr. Richard Kemp and Mr. Fred Rhemrev. Mr. Kemp is a long time friend of Mr. Johnson and a one time drinking partner. Mr. Kemp was aware of Mr. Johnson's problem with alcohol, but he believed that Mr. Johnson's problem in 1983 seemed somewhat better than in prior years. Mr. Rhemrev was a neighbor of the Johnsons, who met the family around 1980 when their sons played soccer on the same team. Although they were not close friends, Mr. Rhemrev was aware of Mr. Johnson's reputation in 1983 and stated that he did not have a reputation as a drunk. Mr. Rhemrev had business dealings as well as social dealings with Mr. Johnson in 1983, and cannot remember ever seeing him drunk.

In June 17, 1983, ten days prior to the date of the Bank's judgment, the Johnsons transferred their interest in the "Eastwood" and "Mather Road" properties to Richard Kemp. Mr. Kemp paid no consideration for the transfers. He stated that Mr. Johnson asked him to do him a favor and he consented. Mr. Kemp did not expect to pay for the property, and did not expect to profit from the transaction. He merely was to hold the property, and did not ask questions. While the documents were signed by Jean Johnson, Mr. Kemp did not deal with Mrs. Johnson. Jean was only involved to the point of signing the papers; she was unaware of the terms of the transaction.

Mr. Kemp never saw any money as a result of the Eastwood transfer. The contract vendees paid off the contract directly to Mr. Johnson at some unspecified date after the transfer to Mr. Kemp. The payoff was in cash for $9,900.

Mr. Kemp did receive the payment on the Mather Road property, but he did not keep any part of it. He received a check from the contract vendee dated September 28, 1983, and used it to purchase a cashier's check made out to Jesse Johnson for the full amount of the payoff, $9,000. Jesse Johnson cashed the cashier's check on Oct. 11, 1983, the day after Mr. Kemp purchased it.

When asked at trial to explain the Kemp transfers, Mr. Johnson stated that he sold his interests in the contracts to Mr. Kemp in order to raise cash to offer as settlement of the Bank's claim. He admitted that he did not receive any money from Kemp at the time the transfers were recorded, and never made a cash settlement offer. He also stated that he intended the sales to Mr. Kemp to be on a discounted basis, but Mr. Kemp stated that he had no memory of discussing discounts with Mr. Johnson. The Court finds Mr. Johnson's testimony, that he intended to raise money by transferring the contracts to Mr. Kemp, to be unbelievable in light of the facts surrounding the transfers.

At a deposition taken on October 25, 1983, Mr. Johnson was asked about his interest in the Mather Road property. The transcript of the deposition p. 29–30 reads as follows:

Q. (Plaintiff's attorney) Whom did you sell that property [Mather Road] to?

A. (Mr. Johnson) A guy named Richard Kemp.

Q. And what did he pay you for the property?

A. It was around $9,000.

Q. And that was in July of this year?

A. Yeah.

Q. And then the Heaths paid him off?

A. Yeah. I heard they have, yeah.

Q. In other words, you assigned your contract vendors interest to him for $9,000?

A. That's right.

Q. And then what did you do with the $9,000 that Mr. Heath paid you,— I'm sorry, Mr. Kemp paid you?

A. We spent it.

Q. And you just spent it for a living?

A. Yeah, that's right.

Q. You spent that $9,000 Mr. Kemp paid to you on the Heath contract just living expenses?

A. That's right. Yeah, it's gone.

A year later in a deposition taken during the bankruptcy proceeding, Mr. Johnson stated that he thought he received the $9,000 from the sale of the Heath contract (Mather Road) in June 1983. Deposition dated October 12, 1984 p. 18.

The parties agree that the schedules and statement of affairs filed by the Johnsons contain errors and omissions. The statement of affairs filed contain very little information about the debtor's financial condition. Under question 5 (income other than from operation of business), the Defendant listed two transactions, H & R Block and the sale of the residence. Under question 13 (payments on loans and installment purchases), the Defendant responded "none". Under question 14 (transfers of property), the Defendant only listed the sale of the residence. Under question 19 (withdrawals from the business), the Defendant marked "N/A". Under question 20 (payments to attorneys), the Defendant did not list payments made to his former attorney.

The Defendant produced the set of schedules he had completed prior to consulting a bankruptcy attorney. He asserts that he had included much of the missing information on those schedules, but the attorney inadvertently left some of the information off when the final draft was typed. Mr. Johnson states that he thought he read the schedules before he signed them. He explained that he must not have noticed the missing material at that time.

## II. Legal Analysis.

█ The party objecting to a discharge has the burden of proving the objection. Bankruptcy Rule 4005. But once that party meets the initial burden by producing evidence establishing the basis for his objection, the burden shifts to the Debtor to rebut the evidence or to satisfactorily explain the loss. *In re Chalik*, 748 F.2d 616 (11th Cir.1984). The Court finds that the

Bank has met its burden and has proved, through establishing the transfers to Mr. Kemp and Mr. Johnson's subsequent misrepresentation of one of those transactions, a case under §§ 727(a)(2) and (a)(4). The Court also finds that the Defendant's explanation for the disappearance of over $39,000 to be unsatisfactory and requires a denial of discharge under § 727(a)(5).

### A. Section 727(a)(2).

Section 727(a)(2)(A) provides:

The court shall grant the debtor a discharge, unless—(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition.

█ Denial of a discharge under § 727(a)(2) can only be made upon a finding of actual intent to hinder, delay, or defraud. Because it is often impossible to produce direct evidence as to fraudulent intent, intent "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *In re Devers*, 759 F.2d 751, 753–54 (9th Cir.1985). The Court finds that the Defendant's transfers to Mr. Kemp of his interest in two pieces of property for no consideration, on the eve of the Bank's obtaining a judgment, were transfers made with the actual intent to hinder, delay and defraud a creditor. Mr. Kemp's explanation that he understood that he would hold the property for Mr. Johnson's benefit is much more believable than Mr. Johnson's claim that he expected Mr. Kemp to buy his interest in the properties. The fact that Mr. Johnson received payment directly from one of the contract vendees, and kept all the money without involving Mr. Kemp, plus the fact that Mr. Kemp gave Mr. Johnson all the proceeds from the other property, is further evidence that the conveyances were never meant to have any effect other than

to conceal the property and hinder creditors. "The transfer of title with attendant circumstances indicating that the bankrupt continues to use the property is sufficient to constitute a concealment." *In re Kauffman*, 675 F.2d 127, 128 (7th Cir.1981). Mr. Johnson's protestations that he did not mean to mislead or defraud anyone by his actions are simply unbelievable.

■ The Defendant argues that even if the transfers to Mr. Kemp are found to be made with the requisite intent, those transfers will not bar the discharge because the money from the property was recovered by the Defendant prior to the filing of the petition. The Defendant asserts that this conclusion is mandated by the recent Ninth Circuit decision, *In re Adeeb*, 787 F.2d 1339 (9th Cir.1986). The Court cannot agree that the holding of *Adeeb* will save Mr. Johnson from a denial of discharge under § 727(a)(2)(A).

*In re Adeeb*, 787 F.2d 1339, involved a debtor who, upon the advice of an attorney, transferred property to friends for no consideration in order to hinder the collection efforts of one particular creditor. When Mr. Adeeb's financial condition worsened, he consulted a bankruptcy lawyer who advised him to reverse the transfers and to disclose them to his creditors. Mr. Adeeb immediately began to reverse the transfers. He also called a meeting of his creditors, told them of the transfers, and stated that he was reversing them. Before he could recover all the transferred property, an involuntary bankruptcy petition was filed against him. 787 F.2d at 1341–42.

The Court of Appeals considered the issue of whether a debtor who transferred property within one year of the filing of a petition, with the actual intent to hinder a creditor, should be denied a discharge if the property was recovered prior to the filing of the petition. The Court determined that he should not be denied a discharge, "*if he reveals the transfers to the creditors*, recovers substantially all of the property before he files his bankruptcy petition, and is otherwise qualified for a discharge." 787 F.2d at 1345 (emphasis added).

The Court placed great emphasis on the necessity of a full disclosure by the debtor to his creditors. It decided that a reading of § 727(a)(2) to allow the discharge of a debtor who has recovered substantially all the transferred property for the benefit of his creditors prior to the filing of the bankruptcy petition, would further the Code's dual policy of securing the "equitable distribution of the bankrupt's estate among his creditors", and relieving the "honest debtor" from the weight of oppressive indebtedness. *Id.* Otherwise, there would be no incentive for a debtor who improperly transfers property to reveal his actions to his creditors and to recover the property prior to filing bankruptcy.

The facts in the case at bar are in stark contrast to those in *Adeeb*. Mr. Johnson did not reveal his fraudulent transfers to his creditors. In fact, he deliberately lied about the transactions during the deposition taken by the bank on October 25, 1983. He had received payment on the Mather Road property through Mr. Kemp only 14 days prior to the deposition, yet he represented that Mr. Kemp had paid him $9,000 in July and that he had since spent all the money on living expenses. This Court can reach no other conclusion than that Mr. Johnson lied in order to conceal the true nature of the Kemp transaction and to prevent the Bank from reaching any part of the $9,000 payment. This conduct falls far below that insisted upon by the Court of Appeals in requiring that the debtor reveal the transfers to his creditors.

The Defendant's argument is also patently unacceptable when one considers the purpose behind the *Adeeb* decision. The court wrote, "[e]ncouraging debtors to recover improperly transferred property facilitates the equitable distribution of assets among creditors by ensuring that the trustee had possession of all of the debtor's assets." 787 F.2d at 1345. Mr. Johnson argues that by receiving payment after the paper transfer to Mr. Kemp he "recovered" the property, and thus ought to receive a discharge. Clearly, the *Adeeb* court contemplated recovery for the benefit of credi-

tors, not recovery of cash which the debtor conceals from his creditors and spends, or purports to spend, prior to filing bankruptcy.

B. *§ 727(a)(4).*

Section 727(a)(4)(A) provides:

The court shall grant the debtor a discharge, unless—(4) the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account.

■ At the deposition taken on October 12, 1984, in connection with the bankruptcy case, the Defendant stated that he had received payment for the Mather Road property in June of 1983. This was done to further the deception perpetrated upon creditors by the Kemp transfers and was done with the intent to deceive the Bank. Thus, this statement alone would require the denial of discharge.

■ The Bank has presented evidence of over 25 alleged false oaths made by the Debtor, most made in the form of omissions and mistatements on the bankruptcy statements filed with this Court. Because the Court has found one false oath it will not attempt to address the remainder of the statements specified by the Bank.

C. *Section 727(a)(5).*

Section 727(a)(5) provides:

The court shall grant the debtor a discharge, unless—(5) the debtor has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities.

■ The Defendant has sought to explain the loss of over $39,000 in the year prior to bankruptcy, or approximately $107 per day, with testimony concerning his use of alcohol, drugs, and prostitutes. While this Court cannot say that evidence of such use will never be a satisfactory explanation of a loss of assets, in this case the Defendant's credibility is so low that his substantially uncorroborated testimony as to his habits during 1983 is not enough to satisfy the Court. Mr. Kemp stated that Mr.

Johnson appeared to be somewhat better in 1983 than in prior years, and Mr. Rhemrev, who did business with Mr. Johnson in 1983 and lived in the neighborhood, was unaware that Mr. Johnson had a problem with alcohol. Mrs. Johnson's testimony as to Jesse's drinking problem in 1983 is not enough to convince this Court of its severity given her interest in the proceeding and her testimony that she was often unaware of what Jesse was doing for long periods of time. She did not testify with any specificity regarding what sums, if any, Mr. Johnson spent on his drinking, drug and prostitution activities. Other courts have refused to accept a debtor's uncorroborated explanation as to the disposition of large sums of cash taken from the liquidation of the debtor's assets in situations similar to the case at bar. *See Matter of Reed,* 700 F.2d 986 (5th Cir.1983); *Crider v. Jordan,* 255 F.2d 378 (4th Cir.1958); *In re Yokley,* 61 B.R. 198 (Bankr.W.D.Ky.1986) (all rejecting uncorroborated gambling loss as satisfactory explanation). The Court's decision in this case is not based upon a judgment as to the moral turpitude of the Defendant's conduct, but is rather based upon its lack of faith in the Defendant's credibility as revealed by his testimony at trial and his conduct in general.

D. *Section 727(a)(3).*

■ The Bank also seeks to deny the Defendant a discharge based on his failure to produce books and records for the trial. The Court will not deny discharge on this basis because it appears that the Defendant did have records which were destroyed after the mistaken entry of a discharge order.

E. *Attorney Fees.*

■ The Bank seeks attorney fee based upon its discovery of a contract/note for $19,800.00, payable on demand from Charles Fox to Jesse Johnson for the sale of Woodridge lot number two, which was not listed by the Defendant on his schedules. The request is based upon § 503(b) and an Order dated March 8, 1984, signed

by Judge Folger Johnson which authorized the Bank to receive attorney fees if it discovered assets for the benefit of the estate. The Bank has presented no evidence that the contract/note has benefited the estate. The Court will defer ruling on the Bank's request for attorney fees until such time as it presents evidence that the contract/note benefited the estate and the extent of the benefit.

### III.   Conclusion.

The Debtor, Jesse A. Johnson is denied a discharge under the provisions of § 727(a)(2), (a)(4) and (a)(5) of the Bankruptcy Code.

This Memorandum Opinion shall constitute Findings of Fact and Conclusions of Law, and pursuant to Bankruptcy Rule 7052, they will not be separately stated. Plaintiff Pacific Western Bank is directed to prepare, serve and lodge a proposed judgment in accordance with the views expressed above.